Good morning, Your Honors. I'm Carol Hedlund, and I'm here representing the appellant Albert Einstein Medical Center, and I would like to reserve four minutes for rebuttal. This case involves the application of new standards developed by the Secretary in 2000 to disallow the loss incurred by Old Germantown when it merged with New Germantown in 1997. These new standards were inconsistent with the agency's past policies and interpretations, and therefore we contend were impermissibly retroactive. The administrator disallowed the Old Germantown's loss on two grounds. One was a related parties ground. They found that they were related both before the merger and after the merger under a continuity of control theory. And the other reason the administrator disallowed the loss was saying it was not a bona fide sale. It did not meet the criteria for a bona fide sale in that it didn't have reasonable bargained for consideration. Both the continuity of control test and the requirement that statutory mergers meet bona fide sales were not articulated until the 2000 program memorandum and a definition put into the provider reimbursement annual in 2000. And those standards were flatly inconsistent with the prior agency policy. And we think the best evidence for that comes from the government itself. When the OIG issued a report in 1997 analyzing hospital losses under existing Medicare rules, the OIG said, you want to fix this agency, you need to get Congress to change the statute. And CMS or HCFA agreed with that in its comments to the report and said, yes, we're going to go in and we're going to change the statute. And they succeeded in getting Congress to do that. And the statute was changed effective December 1, 1997. Once that happened, then the agency said, oh, but we still have these losses from prior years. How can we set about to disallow them from our point of view? And that's when they started to reinterpret the prior agency rules. And I really want to focus on the bona fide sale piece because that's the one that seems to have in other courts some trouble. Our position is that a statutory merger is very different from a bona fide sale. And the agency set a bright line distinction between the two of these. In January of 79, it issued the bona fide sale rule. In February of 79, it issued the statutory merger rule. And they didn't reference each other. You know, they didn't say when they issued the sale. As a matter of fact, the preamble language to that 79 rule only said it has to be a bona fide transaction. We do realize the statutory merger reg references subsection F of the regulation, which is the section that deals with recognition of gains or losses. The concept of a bona fide transaction doesn't include reasonable consideration. Prior to 2000, that was not in the Provider Reimbursement Manual. And prior to 2000, bona fide sale meant a transaction between unrelated parties. That's how the OIG defined it in its report. It's what this court found in the Monsoor case. And there was a 1989 agency manual talking about bona fide sales saying that means a sale between unrelated parties. The other definition that has showed up from time to time prior to 2000 is that a bona fide sale is a sale made in good faith for valuable consideration without notice of defect in title by unrelated parties. We contend that if you find we have to meet bona fide sale criteria, this transaction met those criteria. The parties were... Are you suggesting that the Secretary had no authority to interpose the bona fide sale requirement for interpretation, however? If they had done... Is this a question of what the Secretary could have done? In the sense that if they were writing on a blank slate, they could have done that. But that was not the agency's interpretation. If you look at the Medicare Intermediary Manual, which was issued to tell intermediaries how to interpret the statutory merger regulation, and that was issued in 1987, all it said was if the parties are unrelated prior to the merger, a gain or loss will be recognized. You adjust depreciation for the acquiring entity and a gain or loss is... Let me focus on what was really going on here. Let me see if you agree. I just jotted down something as I was working up this case, trying to get an overview. It seemed to me that old Germantown, which was a non-profit, non-stock corporation, concluded that it was unable to continue to carry out its own mission effectively. And by its merger, it was seeking to assure the carrying out of that mission, that is the health care of the community, by Albert Einstein Health Network, a provider network with greater resources and perhaps greater expertise. To accomplish this, it transferred control of its assets to the network. Correct. While the network may have understandably been interested in some continuity, the essence of I couldn't agree more. Okay. Well, I want to see if you stay with me. The motivation of old Germantown's board, who negotiated the deal with the network, and indeed their fiduciary duty, was not to maximize the consideration paid by the network, but rather to assure the success of old Germantown by transferring quality health services to its community. And the board might well decide to take less from an acquirer with greater resources than from a weaker successor, because what they were interested in doing was assuring the continued success of their mission. But as part of doing... Assuming that bona fide transaction has a reasonable compensation component, and I realize you maintain otherwise, but assuming it does, doesn't that mean that this transaction, the administrator has pointed to the gap between the value of the assets transferred and the consideration given, and there's a significant gap, 30 million dollar gap. Doesn't that suggest that this is not that the administrator was within his or her discretion to find that this was not a bona fide transaction for reasonable consideration? We think not. We disagree with that. In the first place, when old Germantown issued the RFP, it had a number of items that it was looking for, one of which was fair value for its assets, and the other thing that was very important to it was that the deal be done quickly, because it was losing money every month. May I interpose that my view of this was a little different, or my maybe, Judge Stapleman's. One might look at this record and say what it was really looking for was continuity of control, and that part of that was that the same individuals who controlled old Germantown, i.e. the president of the facility, would remain as the chief executive officer of the new facility, and the identity of, I guess it was six or seven people on the board, the new board, and also six or six on the board of Einstein. And rather, although I think one might look at this and say part of the mission was to continue the mission of serving the community, it was not divorced from the individuals wanting to retain continuity of control. How do you answer, and they didn't take what might have been a better proposal because it didn't include those provisions. How do you answer that? Well, all of the provisions you cited were in Einstein's offer, so Einstein was the one that was getting benefit of having a little bit of carryover the board. All the board members, I know there's reference to all the board members who wanted to carry over could. Well, there's also testimony in the record that most of those board members wanted to resign. They did not want to carry over. There were only six board members that carried over, which was 15 percent of the new board. I know having been on boards, it depends on who the board members are, and sometimes the board members who are the leading board members may have been the ones who carried over. But that carryover, the new board had to exercise any delegated authorities it had totally under the control of the parent, Einstein. Any delegated authorities that it had were, it was only a recommended board. It could only be subject to Einstein's control. I would like to address the primary health system offer if I can a minute to do that. Because you said that looked like a better offer than what we got. If they had taken the primary health offer, they would have gotten $15 million, which didn't even cover half of old Germantown's debt. They would have given up their hospital assets. They had endowment funds. They couldn't use their endowment funds to pay off the debt. The endowment funds likely would have been forfeited because they no longer had the hospital assets. They weren't doing it anymore. So old Germantown would have been left with a lot of debt and no assets. I don't think that's a better deal. Plus it was a for-profit agency, and I think there would have been difficulties and at least time delays in getting through the orphans court, and time was of the essence. The deal was structured so that, couldn't one say that the deal was structured so that they would get more from Medicare for the depreciation? This was, the deal was structured entirely in accordance with the Medicare rules. And if you look at the Geller letter in the file, which we cited too, in a statutory merger, you take the consideration are the liabilities that are assumed, and that's what you use to cite, which deals with the consolidation. He says the consideration is less than the fair market value, but you still allocate it all and determine the gain or the loss. Why don't we hear from the government first, and we'll get you back. Thank you. We could have used the government representative in the last case in some of your insight. I mean, I just am surprised to hear the prior case throwing around notions of fair market value Medicare. That certainly woke me up when I was sitting in the back of the panel. May it please the court, my name is Joel McElvain. I'm from the U.S. Department of Justice for the Appellee. And I'm going to do the best that I can to agree both with Judge Slobider and Judge Staples with the discussion you just had. I'm not sure we really went that far apart. I don't think that you were, so hopefully this will not be difficult for me to accomplish. And let me begin this way. The Medicare Act pays providers for their actual and reasonable costs. And one of those costs, of course, is depreciation on the use of equipment used to serve Medicare patients. Now, there will be times when the depreciation schedule does not accurately reflect what the actual depreciation incurred was. And an example of that would be a transaction that's you know what the true value of the asset is when it's disposed of in a bona fide sale. If that's different from the depreciation schedule, you recover the gain or you pay the loss to true up what the actual costs of the provider were. Now, it's apparent from that that you need some sort of transaction that actually shows you what the real costs were to justify Medicare making the payment or regaining the gain. You need a transaction that is for fair value. There's a transaction at arm's length between unrelated parties. So for that reason, Medicare has enacted 413.134, which lists the circumstances in which an adjustment to depreciation will be recognized, one of them being a bona fide sale. And then on top of that, they've enacted 413.134L, it's now K in the regulations, but L at the relevant time, which governs mergers and consolidations and transfers of capital stock. And the approach that the Secretary chose in enacting the regulation is that a merger or consolidation qualifies for the depreciation adjustment if it meets the standards that otherwise already exist in the law. So it has to be the equivalent of a bona fide sale. It has to be a transaction between unrelated parties at arm's length. And under these circumstances, this transaction, particularly at issue in this case, was not a bona fide sale. It was not a transaction between unrelated parties. So for two independent reasons, no adjustment to the depreciation can be realized in this case. Take it from your comment, Judge Stapleton, I, the one, I agreed with everything you said in your comment, except with the one small proviso that, that there was a transfer of control. But I will, that there was a transfer of control. I would dispute, I would say that there was not a transfer of control. How can you, there was no transfer of control of these assets from old Germantown to the network when, as a result of the transaction, there was no Germantown, old Germantown, and the sole member owner of the assets was the network. And the network could determine who was on the board and all that sort of stuff. Well, the answer to that question comes from 413.17, which is the related party rule, which tells you that the relevant standard is, is there significant continuity of control? There doesn't have to be absolute continuity of control. There just has to be some significant continuity from the old owners to what is supposedly the new entity. And the reason it's phrased that way, significant and not absolute or majority or total, is because it's a prophylactic rule. You want a general rule to just rule out transactions where there's even the potential for some inflation or the potential for some incentive not to strike a fair price. And so here you have significant control because you have the chairman and the vice chairman, I believe, of the board continuing. You have the president continuing. As part of the transaction itself, old Germantown, in discussions with Einstein to create new Germantown, old Germantown with Einstein negotiated $6 million, but not for itself. It negotiated $6 million to go to the new at arm's length when you're trying to benefit. How was it negotiating rather than for itself? It wasn't going to exist after the merger. It wasn't at its expense. I'm sorry. Go ahead. No, no, no. I didn't mean to cut you off. Old Germantown was not and did not exist after the merger. Correct. Yes. But it had principles that continued in operation with entity. Perhaps a more extreme scenario than exists here, but I think a scenario that illustrates the point I'm trying to make is you could imagine an entity that just dissolves itself and recreates itself with the new entities. Of course, old Germantown or old provider A in this hypothetical would no longer exist, but of course there's still continuity of control with that new entity. So you have to look not just at the formality of the old corporation no longer existing. You have to look at the principles of that organization and what happens to the principles of that organization. And many of them did continue with the new entity. So the network doesn't control the current asset? There's some aspects in which Albert Einstein has some control. They're the significant membership from old Germantown. He has real power. A minority, six unrelated, I mean otherwise unrelated individuals. I'm sorry. You're talking about six otherwise unrelated individuals who comprise a minority of the board of the new organization. All of them were appointed by the old board. In addition to the six, there are other members that were appointed by the old board specifically for the purpose of ensuring the continuity of the mission. So they were selected because they would have a common viewpoint. Continuity is obviously important in any ongoing operation. Absolutely. And that's ultimately the point that I'm trying to get to is that the notion that old Germantown set up this transaction this way to continue the hospital's mission is not a bad thing. They're not bad people. It's entirely salutary that they would want to serve the community of course. So it's not a judgment on the character of the people under this transaction. It's just is this transaction the kind of transaction that allows you to calculate whether there's some difference in the depreciation that has occurred. And it is not because this is not a transaction where there was a real exchange of fair market value. It's not a transaction that was truly at arm's length. I know that you are here to sustain Judge Buckwalter's opinion. Is there anything in his opinion that you think is inaccurate? Oh, I confess that I don't have the entirety of the opinion entirely in hand. But that's what's on appeal. Correct. But I would defend both the bona fide sale ruling. I would say that as far as the related party ruling is at issue, that is a second independent ground. So this court can affirm the administrator on either of those two grounds. Now let me see if I understand your comment to Judge Stapleton who asked you about continuity of control. And Judge Stapleton asked you, and it's obviously perfectly logical, he says they only had six members of the new board. And he says, and I think it's 45 or 40 members. He says, how can that be controlled? Because I understand his question. And you said, but they picked, helped pick the other people who would be controlled. Yeah, go ahead. Old Germantown had the right to appoint one half of the board of the new entity. Six of the members came directly from the Old Germantown board. And on top of that, can't do the math in my head, but whatever gets you up to one half, were appointed by Old Germantown. So that's one element of the significant control that Old Germantown had. One is that as part of the agreement itself that created New Germantown, to which New Germantown an entire existence, Old Germantown ensured that New Germantown would serve the old entity's mission. That is an element of control. An entirely salutary reason to exercise control, but nonetheless it is an exercise of control. The president continued in the same capacity. He had real powers under the bylaws. So, and the further demonstration on top of that, this is not an arm's length transaction, is Old Germantown negotiated consideration not to go to its benefit, but to the new entity's benefit. That in and of itself shows that there is continuity. What about the staff? Was the staff, nursing staff, et cetera, what was? I don't know. I believe that many of the staff continued. That was my understanding. I think I would concede that unless a particular staff had control aspects of the performance of their duties that they wouldn't be relevant. But you look at the board, you look at the management team, and there was continuity. And all of these folks are there at the pleasure of the network. They have no job security, let's put it that way, because the network is the sole owner of the corporation. The network has absolute control, the wholly owned subsidiary. Correct. But the bylaws set forth the terms of the board members and I believe also the term of the president. So, I wouldn't say that there was a wholly unrestricted. And the fact is they did have real powers of control. Now, whether it gets fuzzier because there's a question of how much they have to deal with the network, in my view, is irrelevant because the question is not who has absolute control. You don't pick one entity or one person who has absolute control. You look at the totality of the circumstances to determine if there's some continuity of what is significant control. Again, because it's a prophylactic rule. You're drawing the box broadly to try to broadly take out all transactions where there's the incentive not to have. We're going to run out of time here. What do you say, and your friend across the way says that there were violations, several statutory violations, because the law that the administrator acquired was applied retroactively without notice and comment and rulemaking? The easiest and most direct answer is there was nothing retroactive because Germantown, in fact, knew of the Secretary's interpretation. And if you can look at pages 322 of the appendix or pages 709, 710 of the appendix, those are direct statements from the Germantown principles that we knew we had to structure this transaction in a particular way to try to meet what we know the Secretary's interpretation to be. So, the claim of surprise is just not simply possible on this record. Can I go back to continuity of control? Certainly. I didn't get to answer that. And when you're talking, Judge Stapleton suggests, what is the time that matters for purposes of the depreciation, counting of the depreciation? Is it when the transaction happened? I mean, suppose, in fact, the Einstein people use whatever power they have and knock off all of the old Germantown people on the board. Would that matter for purposes of the continuity of control issue? I think that the way you look at it would be what the parties know at the time that the transaction is completed. So, if as of 1995, I believe is the date of the transaction, if as of 1995, the parties expect that the board will continue, that the president of the entity will continue, that the mission of the hospital will continue, then that shows continuity of control. And if a year later something happens where they're wiped out for some reason, I think that's less relevant because it goes to what the parties are thinking at the time of the transaction. And if that happened, could they then come back and say, give us credit for depreciation? I don't think so. Because that's the bottom line. That's what we're talking about is the depreciation. Right. I think you have to think about what the parties were thinking of at the time of the transaction. And at the time of this transaction, they were not attempting to get fair consideration. There was no consideration of trying to get fair market value. They were attempting to ensure that there was continuity of control. So, if that later proved to be incorrect, that's not this record, but if it later proved to be incorrect, I just don't think it'd be relevant because it goes to what they're thinking when they're negotiating the transaction at the time. Now, your friend raised the PHC offer. What is the relevance of that from your standpoint? They would have gained $56 million more from the PHC offer than what they realized from Einstein. You mean the old Germantown? Old Germantown would have gained that. They would have gained, I believe, a $27 million gain as opposed to a $29 million loss, or perhaps I have the numbers reversed. And I think in and of itself, that is very probative, if not conclusive evidence that they were not attempting to get fair consideration. Now, there may have been reasons ultimately that PHC could not have gone forward, but they decided in less than five business days that they weren't even going to try to pursue PHC to try to figure out some other way to restructure the transaction to maybe only gain $40 million than the $56 million that was on the table, or something. Given the huge discrepancy, you would think somebody motivated to get reasonable consideration or motivated to maximize consideration would have at least explored the opportunity, and they didn't do that. So that's the relevance of PHC from the government's perspective. Thank you. Do you have any questions, Morris? No. You haven't asked any questions. Have any questions? Okay. Thank you. I would like to pick up with the last point Mr. McElveen raised about they didn't try to get maximum consideration. That is a criteria that didn't exist anywhere until that 2000 program memorandum came out. And what we have in the record of this case is testimony from former agency officials, the ones that were in charge of the statutory merger regulation and the manual provision that said that they were using the assumption of liabilities as the consideration. There was no way in a statutory merger you could maximize the consideration because your liabilities are what they are on the books. The government says, oh, Germantown should have worked harder to get more additional compensation. If they had gotten any more money from Einstein, it just would have gone to Einstein by operation of law at the time of the statutory merger. So when he said there was no surprise, there was a big surprise about this criteria for trying to maximize reimbursement that never showed up anywhere prior to the year 2000. He cited us to several, unfortunately I didn't scribble them down all down, but he cited us to several places in the record that he said demonstrate that old Germantown was aware of the fair consideration requirement. I believe that the pages he's talking about refer to, there were rumors in the industry at the time that Medicare was, or the intermediaries were trying to impose some kind of There were only six board members that were interested anyway in serving on the new board, but they wanted to make sure they didn't have a lot of representation on the new board. That they were aware of, but just because they were aware of the continuity of control provision doesn't mean it was a valid policy. And we really think the Tenth Circuit in the Via Christi case got that right when they said continuity of control is inconsistent with the plain language of the statute. Of the regulation. Regulation as the Tenth Circuit has held. Yes. And as for any contention that the parties were related prior to the transaction, the government sort of fabricated that from the fact they both signed the definitive agreement and then worked to make it happen. There were two separate boards, there were no overlapping board members, and each agency was responsible for their own board. So I do not think the parties were related either prior to the merger or under a continuity of control theory. In terms of the $6 million that they said they were, Old Germantown was trying to negotiate for Einstein's benefit, that was in the original offer that Einstein made. A lot of the terms that the government says Old Germantown was trying to get, they were all in the original Einstein offer to us. So obviously Einstein thought there was some value to getting these things. I also want to say in terms of reasonable consideration, that we think Old Germantown got reasonable consideration in this deal, if in fact that's the standard. It had all of its liabilities of $34 million paid. Among the $69 million of assets, $38 million of that was endowment funds. I'm not saying those endowment funds had no value, but number one, there is no market for them. You can't go out and sell your endowment funds, so there is no fair market value. That $38 million was sort of a present value of a long-term income that came in every year. There were restrictions on the use of that income. They couldn't use the income to pay the debt. So we think, and if you took the endowments out of the picture, Old Germantown got more in consideration than all the rest of its assets. But Einstein's own account testified that $37.9 million was the fair market value of the endowment. It's the present value of the endowments, which may be considered fair market value from an accounting point of view, but if you went out on the street and said to someone, hey, give me $38 million and I'll give you this package of endowments that maybe over the next 20 years you're going to get $38 million, a willing buyer's not going to give you $38 million for it. Where did the value come from that the administrator used for the non-monetary assets? Somebody says book value in the briefs and the other, there is other assertions that there was an appraisal of those assets within a year of the merger and that the appraised value was used. There was an appraised value of $11,500,000 for the land, building equipment, buildings, and intangibles. If you look at it, this is all in our calculation, which is on page 538 of the joint appendix. We think that appraisal, it was done very close in time after the transaction, but very close in time, is a little overstated in the sense that part of the calculation was an income determination and it understated the losses that Old Germantown was accruing. We think in the totality of the pictures, if you apply a reasonable consideration standard, Old Germantown did get reasonable consideration. I see that my time is up. Thank you very much. Thank you. Thank you both. We'll take the matter under consideration. Okay.